**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1476-23

IN RE CHALLENGE OF
CLAYTON SAND COMPANY
TO DECEMBER 4, 2023
AMENDMENTS TO
N.J.A.C. 7:50-1.1 et seq.

_____

Argued October 29, 2025 – Decided July 15, 2026

Before Judges Gummer, Paganelli, and Vanek.

On appeal from the New Jersey Pinelands Commission.

Kevin J. Coakley argued the cause for appellant Clayton Sand Company (Connell Foley LLP, attorneys; Kevin J. Coakley, of counsel; Ryan A. Benson, on the briefs).

Jason Stypinski, Deputy Attorney General, argued the cause for respondent New Jersey Pinelands Commission (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Jason Stypinski and Lindsay H. Carter, Deputy Attorney General, on the briefs).

Kaitlin Morrison argued the cause for amicus curiae Pinelands Preservation Alliance (Eastern Environmental Law Center, attorneys; Kaitlin Morrison, on the brief).

Christopher J. Norman argued the cause for amicus curiae Winslow Township, County of Camden (The Platt Law Group, PC, attorneys; Christopher J. Norman and Stuart A. Platt, on the brief).

PER CURIAM

Appellant Clayton Sand Company (Clayton Sand) appeals from the adoption by the New Jersey Pinelands Commission (Commission) of amendments to the Pinelands Comprehensive Management Plan (CMP), N.J.A.C. 7:50-1 to -10.35. The amendments provided water management standards for new diversions from the Kirkwood-Cohansey aquifer located within the Pinelands National Reserve (Pinelands). Clayton Sand contends the Commission's rulemaking was unauthorized and, thus, ultra vires; arbitrary and capricious; and not in compliance with certain procedural requirements. Considering those contentions in light of the applicable principles of law, we affirm.

I.

We begin by detailing the federal and state efforts to protect the Pinelands and regulate activity within it. We then turn to the procedural history that resulted in the Commission's adoption of the CMP amendments at issue in this appeal.

A. Federal Legislation Pertaining to the Pinelands

In 1978, Congress enacted the National Parks and Recreation Act of 1978 (the Federal Act), 16 U.S.C. § 471i, which established the approximately one million-acre Pinelands, spanning seven counties in southern New Jersey.  16 U.S.C. § 471i(a)(1).  "The Pinelands were the first natural resource to be protected by the innovative 'national reserve' program."  Gardner v. N.J. Pinelands Comm'n, 125 N.J. 193, 198 (1991).  The Federal Act's "first stated congressional purpose . . . was 'to protect, preserve and enhance the significant values of the land and water resources of the Pinelands area.'"  In re Application of John Madin/Lordland Dev. Int'l for Pinelands Dev. Approval, 201 N.J. Super. 105, 108 (App. Div. 1985) (quoting 16 U.S.C. § 471i).  Those water resources included the Kirkwood-Cohansey aquifer, a seventeen trillion-gallon subterranean freshwater reservoir that is a source of potable and non-potable water for residents in the southern part of New Jersey and vital to sustaining wetlands and unique flora and fauna within the Pinelands.  54 N.J.R. 1668(a) (Sep. 6, 2022) (codified at N.J.A.C. 7:50-1.6, -2.11, -6.86); see also Gardner, 125 N.J. at 199 (describing the aquifer as "one of the largest virtually untapped sources of pure water in the world" (quoting S. Energy and Environment Comm. Statement to S3091, (May 10, 1979) (L. 1979, c. 111) (reprinted at N.J.S.A. 13:18A-1))).

In the Federal Act, Congress directed the United States Secretary of the Interior to request New Jersey's Governor to establish a planning entity that would be responsible for developing a CMP for the Pinelands. 16 U.S.C. § 471i(d). According to Congress, the CMP was to include:

> (1) A resource assessment which:
>
> > (A) determines the amount and type of human development and activity which the ecosystem can sustain while still maintaining the overall ecological values described in this section with special reference to (i) ground and surface water supply and quality; (ii) natural hazards, including fire; (iii) endangered, unique and unusual plants and animals and biotic communities; (iv) ecological factors relating to the protection and enhancement of blueberry and cranberry production and other agricultural activity; (v) air quality; and (vi) other appropriate considerations affecting the ecological integrity of the area . . . .
>
> > . . . .
>
> (3) A land use capability map and a comprehensive statement of policies for land use management of the area which:
>
> > (A) consider and detail the application of a variety of land and water protection and management techniques, including but not limited to, zoning and regulation derived from State and local

police powers, development and use standards and permit systems, . . . and any other method of land and water protection and management which will help meet the goals and carry out the policies of the management plan;

(B) include a policy for the use of State and local police power responsibilities to the greatest extent practicable to regulate the use of land and water resources in a manner consistent with the purposes of this section; and

(C) recognize existing economic activities within the area and provide for the protection and enhancement of such activities as farming, forestry, proprietary recreational facilities, and those indigenous industries and commercial and residential developments which are consistent with the findings and purposes of this section.

(4) A coordination and consistency component which details the ways in which local, State and Federal programs and policies may best be coordinated to promote the goals and policies of the management plan, and which details how land, water and structures managed by governmental or nongovernmental entities in the public interest within the area may be integrated into the management plan.

[16 U.S.C. § 471i(f).]

Congress further directed that, after adopting the CMP, the planning entity was required to submit it to the Secretary. 16 U.S.C. § 471i(g)(1). If the

5

A-1476-23

Secretary did not take any action within ninety days of the CMP's submission, the CMP would be deemed approved. Ibid. The planning entity also was required to submit subsequent CMP revisions to the Secretary "in accordance with the procedure set forth in paragraph (2)." 16 U.S.C. § 471i(g)(4). Paragraph (2) details the considerations the Secretary makes in deciding whether to approve the plan. 16 U.S.C. § 471i(g)(2).

B. New Jersey Legislation Pertaining to the Pinelands

Consistent with the Federal Act, the Legislature in 1979 enacted the Pinelands Protection Act (PPA), N.J.S.A. 13:18A-1 to -29. The Legislature passed that law, in part, based on its findings regarding "the environmental degradation of surface and ground waters" in the Pinelands "which would be occasioned by the improper development or use thereof" and "the current pace of random and uncoordinated development . . . pos[ing] an immediate threat to the resources [of the Pinelands], especially to . . . the maintenance of the existing high quality of surface and ground waters." N.J.S.A. 13:18A-2.

The PPA established the Commission as "the planning entity authorized" by Congress in the Federal Act to regulate development in the Pinelands. N.J.S.A. 13:18A-4; see also Phoenix Pinelands Corp. v. Davidoff, 467 N.J. Super. 532, 545 (App. Div. 2021) (finding the Commission was created "to

6

implement the [PPA] and assume primary responsibility for planning in the Pinelands"). According to the PPA, the Commission was "allocated within the Department of Environmental Protection [(DEP)], but, notwithstanding said allocation, the [C]ommission shall be independent of any supervision or control by such department or by the commissioner or any officer or employee thereof." N.J.S.A. 13:18A-4(a).

The Legislature authorized the Commission to "exercise all the powers and duties as may be necessary in order to effectuate the purposes and provisions" of the Federal Act, N.J.S.A. 13:18A-4(b), and also vested it with the power to "prepare, promulgate, adopt, amend or repeal . . . such rules and regulations as are necessary in order to implement the provisions of this act," N.J.S.A. 13:18A-6(j). The Legislature directed the Commission to prepare a "resource assessment" determining "the amount and type of human development and activity which the ecosystem of the [P]inelands . . . can sustain while still maintaining the overall ecological values thereof, with special reference to ground and surface water supply and quality," N.J.S.A. 13:18A-8(a)(1), and "recommendations for water quality standards for surface and ground waters in the [P]inelands," N.J.S.A. 13:18A-6(i).

The PPA also set forth the goals of the CMP. N.J.S.A. 13:18A-9. With respect to the entire Pinelands, the CMP was intended "to protect, preserve and enhance the significant values of the resources thereof in a manner which is consistent with the purposes and provisions of this act and the Federal Act." N.J.S.A. 13:18A-9(a). The goals of the CMP regarding the designated "protection area" of the Pinelands included "[p]rotect[ing] and maintain[ing] the quality of surface and ground waters." N.J.S.A. 13:18A-9(b)(2). The goals of the CMP with respect to the designated "preservation area" included "[p]rotect[ing] and preserv[ing] the quantity and quality of existing surface and ground waters." N.J.S.A. 13:18A-9(c)(5).

C. Original CMP

In 1981, the Commission adopted a CMP, N.J.A.C. 7:50-1.1 to -10.35, which set forth "regulations and standards . . . designed to promote orderly development of the Pinelands so as to preserve and protect" its resources. N.J.A.C. 7:50-1.3. Any development that failed to conform to the "minimum" standards set forth in the CMP was deemed "unlawful." N.J.A.C. 7:50-1.4. The CMP deemed its provisions would control if they were "more restrictive than [the provisions] of any other statute, ordinance or regulation." N.J.A.C. 7:50-2.1.

The CMP divided the Pinelands into eight "management areas" with differing minimum standards based on the ecological sensitivity of each area. N.J.A.C. 7:50-5.11 to -5.12, -5.21 to -5.29. These management areas were the Preservation Area District, Forest Areas, Agricultural Production Areas, Special Agricultural Production Areas, Rural Development Areas, Pinelands Villages and Pinelands Towns, Regional Growth Areas, and Military and Federal Installation Areas. N.J.A.C. 7:50-5.12(a). In particular, the Preservation Area District was deemed the "most critical ecological region in the Pinelands" because it was "especially vulnerable to degradation," being comprised of a "large, contiguous, wilderness-like area of forest, transected by a network of pristine wetlands, streams and rivers, [that] supports diverse plant and animal communities and is home to many of the Pinelands's threatened and endangered species." N.J.A.C. 7:50-5.13(a).

In the original CMP, the Commission noted:

> The most important abiotic element of the Pinelands ecosystem is water, considering its availability and characteristic chemistry. Water is stored in the extensive sand aquifers below the surface. This ground water supports 89 percent of the flow in the Pinelands streams, discharging primarily through the swamps and marshes. It is replenished solely by precipitation, of which about 44 percent of the annual total percolates through[] the sandy soil surface.

[N.J. Pinelands Commission, New Jersey Pinelands Comprehensive Management Plan 12 (1980), https://www.nj.gov/pinelands/cmp/-1980_CMP.pdf.]

Specifically with respect to the Kirkwood-Cohansey aquifer, the Commission observed:

> Although the [Kirkwood-]Cohansey stores a large volume of water, developing it for water supply without recharge would lower the water table. Since most of the Pinelands'[s] unique flora are adapted to a wetlands environment, lowering the water table could disrupt this entire ecosystem.
>
> . . . .
>
> Withdrawal from the [Kirkwood-]Cohansey is most critical because the surface aquatic systems would be directly and immediately affected.
>
> [Id. at 14-15.]

Notwithstanding the "tremendous" study of the Pinelands ecosystem that had already been undertaken, the Commission emphasized that further study was needed to address the "[m]any questions [that] still exist about the complex natural and human relationships within the region." Id. at 264. The Commission highlighted several areas of concern with respect to Pinelands hydrology:

- Because of the unusually low renovative capacity of the Pinelands'[s] groundwater aquifer system, contaminants introduced in one basin may have significant impacts on adjacent watersheds. The scope and magnitude of these interbasin transfers must

10

therefore be understood if existing high quality water supplies are to be protected.

. . . .

- Water quality and quantity monitoring and analysis programs should be designed to provide additional baseline data necessary to determine the impacts of continuing natural and man-induced changes.

- The characteristic ecosystem of the Pinelands depends on a relatively shallow water table. The maximum amount of water that can be withdrawn from the surface aquifer without adversely affecting the ecosystem needs to be determined so that appropriate water supply strategies can be implemented. . . .

[Id. at 267.]

D. New Kirkwood-Cohansey Aquifer Assessment

In July 2001, the Legislature authorized the Commission to prepare an aquifer assessment and report:

The Pinelands Commission shall, in cooperation with the [DEP], Rutgers, the State University, the United States Fish and Wildlife Service and the United States Geological Survey, assess and prepare a report on the key hydrologic and ecological information necessary to determine how the current and future water supply needs within the Pinelands area may be met while protecting the Kirkwood-Cohansey aquifer system and while avoiding any adverse ecological impact on the pinelands area.

[L. 2001, c. 165, ¶ 1.]

The resulting "Kirkwood-Cohansey Project" included twelve separate studies, which together

> showed a direct correlation between simulated groundwater withdrawals and/or simulated streamflow reductions on the distribution and composition of wetland-forest communities, individual wetland species, and wetland-indicator groups. The studies assessed impacts from diversions on nine frog species, the Federally endangered wetlands plant swamp pink, fish and invertebrate assemblages, and vegetation types. Taken together, the studies predicted reductions in the plants and animals that are characteristic of undisturbed Pinelands ecosystems caused by groundwater withdrawals. In particular, the studies showed that a decline of the water table by more than four inches in wetlands caused a sharp decline in wetlands vegetation and reduced the survival rates of three species of frogs found in the Pinelands . . . .
>
> Multiple studies in the Project assessed impacts related to water supply in terms of the water budget. These studies compared water inputs through rainfall and infiltration versus water losses through transpiration and pumping. A hydrologic framework study characterized the hydrogeology of the aquifer. A hydrologic assessment of three watersheds modeled changes to the water budget and created water table maps. An evapotranspiration study evaluated impacts to the water budget due to loss of water evaporated from surfaces or transpired by vegetation. Finally, a hydrologic modeling study was built on the other water budget studies by measuring groundwater and stream flow responses to groundwater withdrawal scenarios. Models were developed to estimate withdrawal impacts.

A-1476-23

[54 N.J.R. 1668(a) (Sep. 6, 2022) (proposing amendments to N.J.A.C. 7:50-1.6, -2.11, -6.86).]

E. 2022 Proposed Amendments

In response to the findings of the Kirkwood-Cohansey Project, the Commission determined it was necessary to amend certain sections of the CMP to better protect the Pinelands. Id. at 1668-69. The Commission was concerned in part that, while development-related adverse ecological impacts were already prohibited, the CMP contained only limited enforceable numerical standards. Id. at 1670-71. In particular, the Commission sought to strengthen the then-existing standards set forth in N.J.A.C. 7:50-6.86, entitled "Water management." Id. at 1675-77. N.J.A.C. 7:50-6.86 then provided:

> (a) Interbasin transfer of water between watersheds in the Pinelands should be avoided to the maximum extent practical . . . .
>
> (b) Water shall not be exported from the Pinelands except as otherwise provided in N.J.S.A. 58:1A-7.1.
>
> (c) All wells and all increases in diversion from existing wells which require water allocation permits from the New Jersey [DEP] shall be designed and located so as to minimize impacts on wetlands and surface waters. Hydrologic analyses shall be conducted in accordance with the New Jersey [DEP] Guidelines for Water Allocation Permits, with an Appendix on Aquifer-Test Analysis Procedures, New Jersey Geological Survey Report GSR 29, 1992, incorporated herein by reference, as contained in pages 53 through 91 of the Technical

Manual for Water Supply Element, Bureau of Water Allocation, Water Allocation Permits dated May 19, 1993, as amended.

(d) All applications for the development of water supply wells or the expansion of existing water distribution systems shall address measures in place or to be taken to increase water conservation in all areas to be served by the proposed well or system. This shall include efforts by water purveyors and local governments to reduce water demands by users and to reduce losses in the supply and distribution system.

(e) Except for agricultural uses, all new potable and non-potable water supply diversions of more than 100,000 gallons per day that utilize the Kirkwood-Cohansey aquifer as a source of water supply and new increases in existing potable and non-potable water supply diversions of more than 100,000 gallons per day that utilize the Kirkwood-Cohansey aquifer may be permitted only if it is demonstrated that:

      1. No viable alternative water supply sources are available; or

      2. The proposed use of the Kirkwood-Cohansey aquifer will not result in any adverse ecological impact on the Pinelands Area.

[N.J.A.C. 7:50-6.86 (1994) (amended 2023).]

Notably, N.J.A.C. 7:50-6.86(e) comported with the water diversion permit system the DEP had established under the Water Supply Management Act (WSMA), N.J.S.A. 58:1A-1 to -17, which applied, with some exceptions, to entities "diverting, having the capability to divert, or claiming the right to divert

14

more than 100,000 gallons of water per day either from a single source or a combination of sources, and to all persons intending to divert more than 100,000 gallons of water per day." N.J.A.C. 7:19-1.4(a).

On September 6, 2022, the Commission published a rule proposal. 54 N.J.R. 1668(a). Citing N.J.S.A. 13:18A-6(j) as its authority to do so, the Commission proposed amendments to N.J.A.C. 7:50-6.86, as well as to an existing fee schedule in N.J.A.C. 7:50-1.6 and definitions contained in N.J.A.C. 7:50-2.11. 54 N.J.R. 1668(a). In particular, the Commission proposed defining "[d]iversion" in N.J.A.C. 7:50-2.11 as the "taking of water from a river, stream, lake, pond, aquifer, well, other underground source, or other waterbody, whether or not the water is returned thereto, consumed, made to flow into another stream or basin, or discharged elsewhere." Id. at 1675 (boldface omitted). That proposed definition mirrored the definition of a diversion set forth in the WSMA, N.J.S.A. 58:1A-3, and in the DEP's water supply allocation permits rules, N.J.A.C. 7:19-1.3(d).

In addition, the Commission proposed defining "[s]tream low flow margin" as:

> the difference between a stream's September median flow and its statistical flow, which is the seven-day flow average in the 10-year period for the stream (7Q10) as reported in the New Jersey Statewide Water

Supply Plan, New Jersey [DEP], 2017, New Jersey Water Supply Plan, 2017-2022: 484; http://www.nj.gov/dep.watersupply/wsp.html, as amended and supplemented.

[54 N.J.R. 1675 (boldface omitted).]

The proposed amendments to N.J.A.C. 7:50-6.86 read in part as follows:

(a) Water shall not be exported from the Pinelands except as otherwise provided . . . at N.J.S.A. 58:1A-7.1.

(b) A diversion that involves the interbasin transfer of water in the Pinelands Area between the Atlantic Basin and the Delaware Basin . . . or outside of either basin, shall be prohibited.

. . . .

(c) A diversion involving the intrabasin transfer of water between HUC-11[1] watersheds in the same basin, Atlantic Basin or Delaware Basin . . . . shall be permitted. If such an intrabasin transfer involves water sourced from the Kirkwood-Cohansey aquifer, the diversion shall meet the criteria and standards set forth at (d) below.

(d) A new diversion or an increase in allocation from either a single existing diversion source or from combined existing diversion sources in the same HUC-11 watershed and in the Kirkwood-Cohansey aquifer,

---

[1] An "HUC-11" or "hydrologic unit code 11" is an "area within which water drains to a particular receiving surface water body, also known as a subwatershed, which is identified by an 11-digit hydrologic unit boundary designation, delineated within New Jersey by the United States Geological Survey." N.J.A.C. 7:50-2.11.

that results in a total diversion of 50,000 gallons of water per day or more (hereafter referred to as a "proposed diversion") shall meet the criteria and standards set forth at (d)3 through 9 below. "Allocation" shall mean a diversion permitted pursuant to a Water Allocation Permit or Water Use Registration Number issued by the New Jersey [DEP] pursuant to N.J.A.C. 7:19.

1. When evaluating whether the proposed diversion meets the criteria set forth at (d)3 through 9 below, all of the applicant's allocations in an HUC-11 watershed, in addition to the proposed diversion, shall be included in the evaluation.

2. The standards set forth at (d)3 through 9 below shall not apply to:

i. A new well that is to replace an existing well, provided . . . the new replacement well will:

(1) Be approximately the same depth as the existing well;

(2) Divert from the same aquifer as the existing well;

(3) Have the same or lesser pump capacity as the existing well; and

(4) Be located within 100 feet of, and in the same HUC-11 watershed as, the existing well; or

ii. Any diversion that is exclusively for agricultural or horticultural use.

[54 N.J.R. 1675-76 (emphasis added).]

In addition, according to the proposed N.J.A.C. 7:50-6.86(d)(3), new diversions would be permitted only in the Regional Growth Area, the Pinelands Towns, the Rural Development Area, the Agricultural Production Area, the Military and Federal Installation Area, and in various Pinelands Villages, including Winslow Township. 54 N.J.R. 1676. Thus, new diversions would not be permitted in the Preservation Area District, Forest Area, Special Agricultural Production Areas, and certain Pinelands Villages. Ibid.

The proposed N.J.A.C. 7:50-6.86(d)(4) required an applicant for a new diversion to demonstrate that no alternative water supply source was available or viable. Ibid. The proposed N.J.A.C. 7:50-6.86(d)(5) required an applicant to demonstrate the diversion would not have an adverse regional or local ecological impact, as defined in proposed N.J.A.C. 7:50-6.86(d)(6) and (7), respectively, on the Kirkwood-Cohansey aquifer. Id. at 1676-77. To determine whether a new diversion would have an adverse impact, the proposed N.J.A.C. 7:50-6.86(d)(6) and (7) required an applicant to provide certain information. For example, the proposed N.J.A.C. 7:50-6.86(d)(6)(iii) required an applicant to "calculate the sum of the proposed diversion and all existing permitted allocations in the affected HUC-11 watershed, and show whether that sum exceeds 20 percent of the stream low flow margins for the year of peak use

established in the New Jersey Water Supply Plan" and to submit a report containing that and other information. Id. at 1676. The proposed N.J.A.C. 7:50-6.86(d)(8) mandated that an applicant document the water conservation measures that had been implemented, or were planned, for all areas to be served by the new diversion, while the proposed N.J.A.C. 7:50-6.86(d)(9) directed an applicant to provide notice of its application to the municipality and county in which the diversion would be located, as well as to all other municipalities and counties in the affected HUC-11 watershed. Id. at 1677.

F. Public Comment Period

Clayton Sand operates a sand-mining business in the Pinelands. On September 14, 2022, its representatives met with Commission staff, advocating for an exemption from the potential new requirements for proposed diversions. Clayton Sand sought an exemption because its sand-mining operations in the Pinelands qualified as a nonconsumptive use according to the DEP and based on the estimated consumptive use rate for mining activities stated in the New Jersey Water Supply Plan 2017-2022. See Div. of Water Res. Mgmt., N.J. Dep't of Env't Prot., New Jersey Statewide Water Supply Plan 2017-2022 4-14 (2017). They explained that Clayton Sand first dredged and then pumped water-containing sand out of a man-made pond, compiled the sand in a nearby

processing plant, and then allowed the water to drain back into the pond via pipes and overland flow. The representatives noted that, although not set forth in any rule, the DEP had informally agreed that approximately ninety percent of the water diverted in those operations was returned to the land.

Counsel for Clayton Sand subsequently participated in an October 12, 2022 virtual public hearing regarding the proposed amendments.[2] Counsel also submitted a November 3, 2022 letter to the Commission, emphasizing the difference between consumptive and nonconsumptive diversions and asserting the rule proposal was ultra vires, arbitrary and capricious, and failed to consider economic considerations. Counsel submitted a report from geologist Brian Blum, who faulted the proposed amendments for: not distinguishing between consumptive and nonconsumptive diversions; disparately treating different Pinelands management areas; and relying on the studies comprising the Kirkwood-Cohansey Project, which he contended created a "flawed scenario of hydrological impacts" because they had relied on "excessive hypothetical conditions."

---

[2] Because of an error in the public notice regarding the October hearing, the Commission held a second virtual public hearing on November 2, 2022. Counsel for Clayton Sand did not participate in that hearing.

Other written comments on the proposed amendments included a November 4, 2022 letter from geologist Jeffrey Hoffman of DEP's Division of Water Supply and Geoscience. In that letter, Hoffman listed recommended changes, clarifications, and corrections to the proposed amendments.

G. 2023 Revised Amendments

After considering the comments received and after meeting with DEP staff members and representatives of the resource-extraction industry, the Commission published a notice of proposed substantial changes to the proposed amendments on April 3, 2023. 55 N.J.R. 577(a) (Apr. 3, 2023). In the notice, the Commission responded to the comments that had been submitted previously regarding the proposed amendments, including comments made by Clayton Sand through its counsel and geologist. The amended rule proposal provided for another public hearing on May 3, 2023, and the submission of written comments by June 2, 2023.

The substantial changes included the addition to N.J.A.C. 7:50-2.11 of a proposed definition of a "nonconsumptive use" as "the use of water diverted from surface or ground waters in such a manner that at least [ninety] percent of the diverted water is returned to the source surface or ground water at or near the point from which it was taken." Id. at 581 (emphasis omitted). That

21

definition follows the definition of a nonconsumptive use set forth in the WSMA. N.J.S.A. 58:1A-3(e).

Additionally, in the newly-proposed N.J.A.C. 7:50-6.86(d)(2)(iii), the Commission exempted from the requirements of N.J.A.C. 7:50-6.86(d)(3) through (9) "[a]ny proposed diversion for a resource extraction operation that constitutes a nonconsumptive use, provided the water returned to the source is not discharged to a stream or waterbody or otherwise results in offsite flow, and the diversion and return are located on the same parcel." Id. at 582 (emphasis omitted). To secure that exemption, the Commission required, in proposed N.J.A.C. 7:50-4.2(b)(6)(xi), that the applicant for a new nonconsumptive diversion provide a

> hydrogeologic report that identifies the volume of the diversion, the volume of water to be returned to the source, a description of the route of return to the source, the methodology used to quantify the volume of water returned to the source, and a description of any other existing or proposed water diversions or discharges on or from the parcel. The report shall also include a map that depicts the location of the diversion, the location of the return to source, the location of all existing or proposed resource extraction operations, and the location of all wetlands on or within 300 feet of the parcel on which the diversion is proposed.
>
> [Id. at 581 (emphasis omitted).]

In drafting that requirement, the Commission had consulted the DEP and asked how it determined a ninety-percent nonconsumptive use rate was met. The Commission sought consistency between what it and the DEP required. The Commission's "evaluation of a diversion application . . . rel[ied] upon a modeling process similar to the DEP's in an effort to avoid the need for duplicative modeling by applicants" to be provided in support of their respective applications for new diversions with the Commission and water allocation permits with the DEP. Id. at 579.

H.  Second Public Comment Period

Counsel for Clayton Sand participated in the May 3, 2023 virtual public hearing. In a May 25, 2023 letter to the Commission, counsel objected to the new proposed amendments in part because they would require Clayton Sand demonstrate its operations qualified as a nonconsumptive use. Counsel claimed it was "virtually impossible" for Clayton Sand to calculate the exact amount of water it returned to the source and attached a second report from Blum in support of that assertion.

In that report, Blum maintained the "resource extraction industry cannot empirically derive" the volume of its diversion or the volume of water returned to the source. He stated estimates of the total volume of water diverted and

returned to the source could be provided, but there was "no practicable way of empirically deriving the exact volume of water returned on a day-to-day basis by the resource extraction industry."

On August 22, 2023, counsel for Clayton Sand again wrote to the Commission requesting that the words "identifies" and "quantify" in N.J.A.C. 7:50-4.2(b)(6)(xi) be changed to "estimates" and "estimate." Counsel emphasized that: under N.J.A.C. 7:19-2.14(a)(4)(ii), the DEP had expressly exempted "sand and gravel operations using water for media transport" from the requirement that diversion sources be equipped with flow meters; and, as such, pursuant to N.J.A.C. 7:19-2.14(a)(5), the DEP permitted sand and gravel operations to "estimate" a diversion quantity "using an accurate and reasonable method approved by the [DEP]." (emphasis omitted).

In an August 25, 2023 meeting, the Commission's Policy and Implementation Committee (Committee) discussed and voted on the revised amendments. Prior to this vote, a Committee member noted that

> [W]e changed some wording in the response to comments to note that we're looking for a hydrogeologic report from resource extraction industry applications to show that it's nonconsumptive, and it has to estimate the volumes of water withdrawn and returned to the source. They were concerned that we were looking for precision, specific numbers, and so the . . . response to comments now clarifies it should align

24

> with what you provide to DEP for demonstrating that it's a nonconsumptive use.

The Committee voted to recommend the adoption of the revised amendments to the full Commission. Counsel for Clayton Sand participated in the meeting and spoke after the vote. He subsequently submitted an August 30, 2023 letter, repeating his concerns.

In an August 31, 2023 email, the Commission's executive director informed Clayton Sand's counsel the Commission would not consider his recent letters because he had submitted them after the June 2, 2023 deadline for written comments. Counsel disputed the executive director's comments in a September 6, 2023 letter.

## I. Adoption of the Amendments

The Commission adopted the revised amendments during the September 8, 2023 meeting. On September 12, 2023, the Commission submitted the amendments to the Secretary for review. On December 4, 2023, the Commission published a final notice of adoption. 55 N.J.R. 2407(a). Nothing in the record demonstrates the Secretary took any action to disapprove the amendments.

Clayton Sand filed this appeal, citing Rule 2:2-3(a)(2), which provides that "appeals may be taken to the Appellate Division as of right . . . to review the validity of any rule promulgated by [a State administrative] agency." We

25

granted leave to Winslow Township and the Pinelands Preservation Alliance (Alliance) to appear as amicus curiae.

## II.

On appeal, Clayton Sand argues the Commission does not have authority to regulate diversions in the Pinelands, and, consequently, the amendment to N.J.A.C. 7:50-6.86 was ultra vires and should be deemed void ab initio. Amicus Winslow Township joins in that argument. Clayton Sand also contends the Commission acted arbitrarily, capriciously, and unreasonably in adopting the amendments to N.J.A.C. 7:50-4.2b(6)(xi) and N.J.A.C. 7:50-6.86 and failed to follow certain procedural requirements in adopting the amendments. The Commission and the Alliance urge us to affirm the amendments' adoption.

## A.

When reviewing an administrative agency's promulgation of a rule, we determine "whether the subject matter falls within the substantive authority delegated to the agency." N.J. Ass'n of Nurse Anesthetists, Inc. v. N.J. State Bd. of Med. Exam'rs, 183 N.J. 605, 610 (2005). An "agency may not, under the guise of interpretation, extend a statute to give it a greater effect than its language permits." GE Solid State, Inc. v. Dir., Div. of Tax'n, 132 N.J. 298, 306 (1993). The party contesting the regulation bears the burden of demonstrating

A-1476-23

"an inconsistency between the regulation and the statute it implements, a violation of policy expressed or implied by the Legislature, an extension of the statute beyond what the Legislature intended, or a conflict between the enabling act and other statutory law that cannot be harmonized." N.J. Ass'n of Sch. Adm'rs v. Cerf, 428 N.J. Super. 588, 596 (App. Div. 2012).

"[T]he grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities." N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562 (1978); see also In re Adopted Amends. N.J.A.C. 7:1C, 483 N.J. Super. 308, 334 (App. Div. 2026) (holding we construe liberally the "[d]elegation of authority to an administrative agency . . . when the agency is concerned with the protection of the health and welfare of the public" (quoting In re Health Care Admin. Bd., 83 N.J. 67, 79 (1980), petition for certif. filed, No. 091693 (Jan. 23, 2026))). A court may not invalidate a regulation that is "within the fair contemplation of the delegation of the enabling statute." Long, 75 N.J. at 561-62 (quoting S. Jersey Airways, Inc. v. Nat'l Bank of Secaucus, 108 N.J. Super. 369, 383 (App. Div. 1970)).

In deciding whether a particular agency action is consistent with and, therefore, authorized by the governing statute, we "determine the intent of the

Legislature."  In re Adopted Amends. N.J.A.C. 7:1C, 483 N.J. Super. at 335 (quoting Med. Soc'y of N.J. v. N.J. Dep't of L. & Pub. Safety, 120 N.J. 18, 26 (1990)).  In doing so, we "may . . .'look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives.'"  Ibid. (quoting Long, 75 N.J. at 562).  We may also "take into consideration the entire [legislative] scheme." Rozenblit v. Lyles, 245 N.J. 105, 122 (2021) (quoting Headen v. Jersey City Bd. of Educ., 212 N.J. 437, 450-51 (2012)).  We will not construe statutory language in a way that "leads to an absurd result or . . . that is distinctly at odds with the public-policy objectives of a statutory scheme," State v. Morrison, 227 N.J. 295, 308 (2016), or "render[s] any part of [the statutory] provisions inoperative, superfluous or meaningless," In re Adopted Amends. N.J.A.C. 7:1C, 483 N.J. Super. at 336 (quoting Zimmerman v. Bd. of Rev., 132 N.J. Super. 316, 322 (App. Div. 1975)).

We defer to but are not bound by an agency's interpretation of its enabling statute.  In re DiGuglielmo, 252 N.J. 350, 359-60 (2022)[3]; see also Haley v. Bd.

---

[3]  Clayton Sand and Winslow Township contend we should not defer to the Commission's interpretation pursuant to Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 412-13 (2024).  In Board of Education of Sparta v. M.N. ex rel. A.D., 258 N.J. 333, 342 n.4 (2024), the New Jersey Supreme Court held "Loper

of Rev., 245 N.J. 511, 519 (2021).  We "overturn an agency's interpretation of a statute it implements . . . when it is plainly unreasonable."  In re Young, 471 N.J. Super. 169, 177 (App. Div. 2022) (quoting In re Comm'r's Failure to Adopt 861 CPT Codes, 358 N.J. Super. 135, 149 (App. Div. 2003)) (internal quotation marks omitted).

If an agency's action exceeds the authority granted by its enabling act, the action is ultra vires and void.  In re Certificate of Need Application for the Mem'l Hosp. of Salem Cnty., 464 N.J. Super. 236, 249-50 (App. Div. 2020).  Although findings that an action is ultra vires are "disfavored," a reviewing court must enforce the will of the Legislature and prevent statutory amendment by "administrative fiat."  In re Agric., Aquacultural, & Horticultural Water Usage Certification Rules, 410 N.J. Super. 209, 223 (App. Div. 2009) (quoting TAC Assocs. v. N.J. Dep't of Env't Prot., 408 N.J. Super. 117, 124 (App. Div. 2009)).

---

Bright is not binding on this Court."  The Court otherwise "has not yet decided whether our deference to agency decisions should track Loper."  In re State, ___ N.J. Super. ___, ___ n.6 (App. Div. Apr. 17, 2026) (slip op. at 18 n.6) (citing In re P.T. Jibsail Fam. Ltd. P'ship, 263 N.J. 208 (2026)). Like the Court in P.T. Jibsail, "[w]e do not attempt to . . . grapple with the reasoning of Loper Bright, because our decision in this case would be the same regardless of whether we deferred to the [Commission's] interpretation . . . or review the [regulatory language] de novo."  P.T. Jibsail, 263 N.J. at 217.

However, although "an administrative agency's actions must not exceed the powers conferred to it by the Legislature, 'the breadth of an agency's authority encompasses all express and implied powers necessary to fulfill the legislative scheme that the agency has been entrusted to administer.'" In re Adopted Amends. N.J.A.C. 7:1C, 483 N.J. Super. at 353 (quoting In re Application of Virtua-W. Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422-23 (2008)). "Agencies are therefore 'allowed some leeway to permit them to fulfill their assigned responsibilities.'" Ibid. (quoting In re Application of Virtua-W. Jersey Hosp. Voorhees, 194 N.J. at 423).

In the notice of proposed substantial changes, the Commission responded to comments contending it lacked authority to regulate water use or water diversions in the Pinelands:

> The Commission respectfully disagrees with these statements. The [PPA] directs the Commission to regulate development and establish standards to allow development without a significant adverse impact to the resources of the Pinelands area. The [PPA] specifically authorizes the Commission to regulate land and water management. N.J.S.A. 13:18A-8.d. This statutory authority to regulate water management is independent of the DEP's authority pursuant to the [WSMA]. The Commission also notes that it does not issue permits; rather, it evaluates development applications and municipal approvals to ensure compliance with the standards established in the [CMP], adopted to implement the [PPA].

[55 N.J.R. 579, ¶ 8.]

On appeal, Clayton Sand renews its contention the Commission lacked authority to adopt the amendments to the CMP at issue, arguing the Legislature empowered the DEP, not the Commission, to regulate water diversions and allocations and that the amendments clash with the WSMA and the State Water Supply Plan. Clayton Sand asserts that nowhere in the PPA is the Commission granted any power to regulate water in general or, more specifically, conserve the water supply through regulation of consumptive or nonconsumptive diversions. Clayton Sand further argues the Commission cannot rely on the goals of the CMP to vest itself with authority to regulate water. According to Clayton Sand, the Legislature vested the Commission only with the power to restrict the development and use of the land in the Pinelands to prevent the degradation of the quality of the surface and groundwater in the Pinelands and vested the DEP with the exclusive authority to manage the water supply of the State, even in the Pinelands. Amicus Winslow Township likewise argues the Legislature conferred exclusive authority on the DEP to regulate water usage throughout the State. We disagree.

Through the WSMA, the Legislature granted the DEP the authority to manage the state water supply by, among other things, taking measures to ensure

31

an adequate supply and quality of water for New Jersey citizens and adopting a uniform water diversion permit system and fee schedule. N.J.S.A. 58:1A-2, -5, -6. The Legislature, however, through the PPA, established the Commission as the state entity with responsibility for matters pertaining to the Pinelands, including matters pertaining to the waters of the Pinelands.

In the PPA, the Legislature created the Commission consistent with the Federal Act. N.J.S.A. 13:18A-2, -4. In addition to the express "powers" granted in the PPA, the Legislature also authorized the Commission to "exercise all the powers and duties as may be necessary in order to effectuate the purposes and provisions [of the Federal Act]." N.J.S.A. 13:18A-4(b). The "first stated congressional purpose of [the Federal Act] was 'to protect, preserve and enhance the significant values of the land and water resources of the Pinelands area.'" In re Application of John Madin/Lordland, 201 N.J. Super. at 108 (emphasis added) (quoting 16 U.S.C. § 471i(b)(1)). The Legislature also expressly empowered the Commission not only to issue reports and recommendations but "[t]o prepare, promulgate, adopt, amend or repeal . . . such rules and regulations as are necessary in order to implement the provisions of [the PPA]," N.J.S.A. 13:18A-6(j) (emphasis added); "adopt a [CMP] for the [P]inelands," N.J.S.A. 13:18A-8; and to "periodically revise[] and update[]" the CMP, ibid. And that's

32

precisely what the Commission did in adopting the amendments to the CMP at issue.

In its overly-narrow interpretation of the PPA, Clayton Sand focuses on the references in the PPA to the Commission's responsibilities regarding the land of the Pinelands and dismisses the Legislature's repeated references throughout the PPA to the Commission's responsibilities regarding the water of the Pinelands. See, e.g., N.J.S.A. 13:18A-6(i) (regarding the Commission's obligation to make "recommendations for water quality standards for surface and ground waters in the [P]inelands"); N.J.S.A. 13:18A-8(a)(1) (the Commission's preparation of a "resource assessment . . . with special reference to ground and surface water supply and quality"); N.J.S.A. 13:18A-25 (barring the exportation of ground or surface waters from the Pinelands); N.J.S.A. 13:18A-9(b)(2) (a goal of the CMP is to "[p]rotect and maintain the quality of surface and ground waters"); N.J.S.A. 13:18A-9(c)(5) (a goal of the CMP is to "[p]rotect and preserve the quantity and quality of existing surface and ground waters").

Clayton Sand would have us ignore N.J.S.A. 13:18A-9, contending it merely identifies goals and does not authorize regulation. However, that clear and unambiguous legislative language gives us direct insight into the

33

Legislature's intent behind the PPA, an intent that includes the protection and preservation of the Pinelands's waterways. And in N.J.S.A. 13:18A-6(j), the Legislature gave the Commission the authority to "promulgate . . . rules and regulations," and amendments to those rules and regulations, "necessary . . . to implement the provisions of [the PPA]," including N.J.S.A. 13:18A-9.

Nothing in the WSMA stripped the Commission of its authority regarding the Pinelands. To the contrary, the Legislature expressly prohibited the DEP from taking any action pursuant to the WSMA that was "inconsistent with the provisions of the [PPA or] the [CMP]." N.J.S.A. 58:1A-15.1.

In N.J.S.A. 13:9B-6(b) of the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, the Legislature authorized the Commission to "provide for more stringent regulation of activities in and around freshwater wetland areas within its jurisdiction." Likewise, some of the regulations implementing the New Jersey Water Quality Planning Act, N.J.S.A. 58:11A-1 to -16, expressly subordinate DEP rules to those contained in the CMP. See, e.g., N.J.A.C. 7:15-3.4 (authorizing revisions to areawide water quality management plan "to reflect a redesignation of a Pinelands [m]anagement [a]rea approved by the . . . Commission"); N.J.A.C. 7:15-4.4 (adopting "[t]he management area designations and boundaries established within the [CMP]" as

the areas eligible for sewer service); N.J.A.C. 7:15-4.5(c)(2) (acknowledging that the "future wastewater treatment needs" in the Pinelands "shall be based on the density and water quality standards established in the [CMP]").

Our courts have repeatedly recognized the Commission's authority regarding the preservation and protection of the waterways of the Pinelands. In a case involving the FWPA, we held the "waters in the Pinelands are regulated by the . . . Commission pursuant to the [PPA], a major purpose of which is to protect the 'especially vulnerable' surface and ground waters in the Pinelands." MCG Assocs. v. Dep't of Env't Prot., 278 N.J. Super. 108, 124 (App. Div. 1994) (quoting N.J.S.A. 13:18A-2). In In re Protest of Coastal Permit Program Rules, 354 N.J. Super. 293 (App. Div. 2002), we held the PPA "expressly gives the . . . Commission the broad power to invoke 'a variety of land and water protection and management techniques.'" Id. at 367 (emphasis added) (quoting N.J.S.A. 13:18A-8(d)(1)). In Orleans Builders & Developers v. Byrne, 186 N.J. Super. 432, 435 (App. Div. 1982), we recognized "[p]revention of degradation of surface and ground waters and of other threats to the Pinelands environment were . . . among the goals of a [CMP] to be prepared and adopted by the . . . Commission."

35

Our Supreme Court held that while the DEP had the authority under the FWPA to issue permits allowing the discharge of dredged or fill material into wetlands located in the Pinelands, the Legislature, in N.J.S.A. 13:9B-6(b), had "expressly bar[red] DEP enforcement of FWPA transition area requirements in the [P]inelands and le[ft] to the . . . Commission that regulatory responsibility." In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 415, 429-30 (2004), In rendering that holding, the Court relied on N.J.S.A. 13:9B-6(b) as well as N.J.S.A. 13:18A-10(c), which provides "no State approval . . . shall be granted, unless such approval or grant conforms to the provisions of [the CMP]" and regulations involving the Commission's management of wetlands and development near wetlands in the Pinelands. In re Freshwater Wetlands, 180 N.J. at 429-30. The Court held:

> Pursuant to [its] authority, the Commission "may provide for more stringent regulation in and around freshwater wetlands within its jurisdiction, which include transition area regulations." N.J.A.C. 7:7A-[2.5(b) (recodified from N.J.A.C. 7:7A-2.9 and amended by 49 N.J.R. 3849(a) effective Dec. 18, 2017)]; see N.J.A.C. 7:50-6.14 (prohibiting development in 300 foot transition area surrounding wetlands in areas under Pinelands Commission jurisdiction); see generally N.J.A.C. 7:50-6.1 et seq. (providing comprehensive wetland regulatory program in [P]inelands).
>
> [Id. at 430 (citations reformatted).]

36

Clayton Sand's reliance on United Water New Jersey v. Borough of Hillsdale, 438 N.J. Super. 309 (App. Div. 2014), is misplaced. That case involved a conflict between ordinances adopted by a Bergen County municipality and DEP regulations. It had nothing to do with the Pinelands, the Commission, or the Commission's authority regarding the Pinelands. For the same reasons, Winslow Township's reliance on In re Agricultural, 410 N.J. Super. 209, and In re Water Supply Critical Area No. 2, 233 N.J. Super. 280 (1989), is equally misplaced.

We are satisfied the Commission did not exceed its authority in adopting the amendments. We discern no conflict arising from the laws and regulations governing the DEP that preempted or rendered invalid the Commission's adoption of the amendments. See In re N.J. Pinelands Comm'n Resol. PC4-00-89, 356 N.J. Super. 363, 366, 377 (App. Div. 2003) (holding endangered-species law enforced by DEP and "regulations designed to protect the Pinelands endangered animal species" enforced by the Commission were "complementary and not inconsistent"); Essex Cnty. Corr. Officers PBA Local No. 382 v. Cnty. of Essex, 439 N.J. Super. 107, 123 (App. Div. 2014) ("[A]n intent to occupy the field must appear clearly." (alteration in original) (quoting Summer v. Teaneck Twp., 53 N.J. 548, 554 (1969))). Clayton Sand's argument to the

contrary fundamentally misconstrues the PPA by disregarding its overarching purpose of protecting and preserving the water resources as well as the land of the Pinelands and the authority the Commission was given to fulfill that purpose.

B.

We reverse an administrative agency's decision if we "conclude that the decision of the . . . agency is arbitrary, capricious or unreasonable, or is not supported by substantial credible evidence in the record as a whole." J.D. ex rel. D.D.H. v. N.J. Div. of Developmental Disabilities, 329 N.J. Super. 516, 521 (App. Div. 2000); see also In re Agric., 410 N.J. Super. at 223 (finding a regulation can be set aside only "if it is proved to be arbitrary or capricious, plainly transgresses the statute it purports to effectuate, or alters the terms of the statute and frustrates the policy embodied in it" (quoting In re Adopted Amends. to N.J.A.C. 7:7A-2.4, 365 N.J. Super. 255, 265 (App. Div. 2003))). "The burden to make that showing 'rests upon the [party] challenging the administrative action.'" In re Protest filed by El Sol Contracting & Constr. Corp., 260 N.J. 362, 373 (2025) (alteration in original) (quoting Lavezzi v. State, 219 N.J. 163, 171 (2014)). Mere disagreement with an agency's determination "does not make it arbitrary, capricious, or unreasonable." In re Att'y Gen. Law Enf't Directive Nos. 2020-5 & 2020-6, 246 N.J. 462, 495 (2021).

In determining whether an agency's decision was arbitrary or capricious, we consider these questions: whether the decision was consistent with the agency's governing law and policy; whether the decision was supported by substantial evidence in the record; and whether, in applying the law to the facts, the agency reached a decision that could be viewed as reasonable. In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. 571, 583 (App. Div. 2014). Implicit in the scope of our review is a fourth question: whether the agency's decision offends the State or Federal Constitution. George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27 (1994); see also Lourdes Med. Ctr. of Burlington Cnty. v. Bd. of Rev., 197 N.J. 339, 360 (2009) (same). As set forth above, we have determined the Commission's adoption of the amendment was consistent with its governing law and policy as well as applicable state and federal law.

Clayton Sand contends the Commission's amendments to N.J.A.C. 7:50-4.2(b)(6)(xi) and N.J.A.C. 7:50-6.86 were arbitrary and capricious because: the quantification requirement contained in N.J.A.C. 7:50-4.2(b)(6)(xi) is virtually impossible to meet, as acknowledged by the Commission, and is inconsistent with DEP regulations regarding water-allocation permits that purportedly allow mines to merely "estimate" the diversion quantity; the Commission did not

A-1476-23

revise its amendments in accordance with DEP geologist Hoffman's comments; Clayton Sand's geologist Blum opined in his report that the studies comprising the Kirkwood-Cohansey Project "present[ed] no evidence that existing groundwater levels in the Pinelands w[ould] be reduced to the extent simulated by models" (emphasis omitted); the amendments prohibit new and increased diversions in some Pinelands management areas and not others, without any regard to relative impact on the Kirkwood-Cohansey aquifer; and the Commission did not "meaningful[ly]" consider the resulting economic impacts. We disagree.

Contrary to Clayton Sand's assertions, the Commission neither "[i]gnor[ed] Clayton[ Sand's] . . . comments on the impossibility of precisely calculating the amount of water a sand mining operation returns to the source" nor conceded the quantification requirement contained in N.J.A.C. 7:50-4.2(b)(6)(xi) was virtually impossible to meet. The Commission expressly considered the comments and revised the proposed amendments in response to them. In its comments to the adopted amendments, the Committee "thank[ed] the resource extraction industry for its comments and explanations regarding the specific nonconsumptive uses of water for hydraulic dredging operations" and stated it had revised the proposed amendments "[i]n order to avoid unintended

negative impacts on the resource extraction industry." See 55 N.J.R. 2408. The Commission explained the parameters of the exception it had adopted for nonconsumptive proposed diversions, describing N.J.A.C. 7:50-4.2(b)(6)(xi) as follows:

> In its amended proposal, the Commission also added a new provision to the application requirement section, N.J.A.C. 7:50-4.2(b)(6)(xi), to specify the information a resource extraction operation must provide to the Commission. This information would most likely be submitted as part of an application for renewal of a resource extraction permit or as a separate application for development that would also necessitate a modification of a New Jersey [DEP] Water Allocation Permit. Specifically, the application for resource extraction will require submission of a hydrogeologic report that estimates both the volume of the diversion and the volume of water to be returned to the source, and the methodology used to estimate the volume of water returned to the source, and describes any other existing or proposed water diversions or discharges on or from the parcel. Reports of this type comport with reports routinely submitted to the DEP for water allocation permit modifications for nonconsumptive use by sand and gravel operations . . . .
>
> [55 N.J.R. 2408 (citation reformatted).]

The Commission considered and rejected a claim it was "virtually impossible" for a mining operation to meet the new requirements:

> The Commission disagrees. Applicants for DEP water allocation permits are required to submit hydrogeologic reports that include a quantitative

discussion of the nonconsumptive nature of the diversion. Contrary to what the commenter states, it is possible for applicants to accurately estimate the amount of water returned to the source. The Commission has, in fact, reviewed a recent report from a resource extraction applicant that included a quantitative analysis of the diverted water that will be returned to the source.

The added requirement at proposed N.J.A.C. 7:50-4.2(b)(xi) was drafted with DEP's water allocation permit requirements in mind. It was intended to facilitate the application process for resource extraction applicants, as those applicants would be providing similar, if not identical, information to the DEP in a water allocation permit application.

[Id. at 2413.]

The record demonstrates the Commission considered the timely comments submitted and revised the proposed amendments based on them. See Tall Timbers Prop. Owners Ass'n v. N.J. Dep't of Cmty. Affs., 413 N.J. Super. 54, 69 (App. Div. 2010) (affirming the validity of newly-adopted regulations, court concludes agency's responses to comments to rule proposals showed agency had considered the concerns expressed and rejected them). The Commission may not have used the exact language Clayton Sand requested, but it was not required to do so. The Commission made clear it was willing to accept the same type of reports provided to the DEP in support of applications for water-allocation

permits. On this record, we discern nothing arbitrary, capricious, or unreasonable about the Commission's adoption of the amendments.

We are also unpersuaded by Clayton Sand's argument the Commission acted arbitrarily and capriciously by not revising the amendments in accordance with Hoffman's comments or entirely rejecting the findings of the Kirkwood-Cohansey Project based on Blum's opinions. The Commission considered Hoffman's comments and explained its responses to them. It concluded, among other things, that because its "evaluation is not for the purpose of issuing a water use permit [like the DEP], but rather to assess the potential impact of a proposed diversion, it is reasonable and acceptable to rely upon the [low flow margin], a published value, as a benchmark." 55 N.J.R. at 2412. Contrary to Clayton Sand's contention, the Commission's responses to Hoffman's comments were neither "dismissive" nor unsupported.

The Commission also considered and responded to Blum's comments, stating it "disagree[d] that the studies are flawed. The studies provide insight into the level of impact that can occur before those impacts have significant adverse effects on the Pinelands ecology." Id. at 2410. Blum's disagreement with the Commission's conclusions does not render the adoption of the

43

amendments arbitrary or capricious. See In re Att'y Gen. Law Enf't Directive Nos. 2020-5 & 2020-6, 246 N.J. at 495.

Clayton Sand argues the Commission's adoption of N.J.A.C. 7:50-6.86(d)(3) was arbitrary, capricious and unreasonable because that regulation prohibits new and increased diversions in some Pinelands management areas and not others, allegedly without any regard to the relative impact on the Kirkwood-Cohansey aquifer. The Commission considered and rejected a comment that disparate treatment of different Pinelands management areas was arbitrary:

> The Commission disagrees. The [PPA] authorizes greater protections for the Pinelands Preservation Area, and a fundamental premise of the CMP is the importance of providing enhanced protection to both the Preservation Area District and the Forest Area based on the ecology of these management areas. The Commission recognizes, however, that certain nonconsumptive uses of water can be consistent with those necessary protections and . . . revised the original proposal to recognize that such uses can maintain the values of the most ecologically valuable management areas.
>
> [55 N.J.R. at 2410.]

In the PPA, the Legislature made the following findings:

> [A] certain portion of the pinelands area is especially vulnerable to the environmental degradation of surface and ground waters which would be occasioned by the

44

improper development or use thereof; that the degradation of such waters would result in a severe adverse impact upon the entire pinelands area; that it is necessary to designate this portion as a preservation area, wherein more stringent restrictions on the development and use of land should be utilized and public acquisition of land or interests therein should be concentrated . . . .

[N.J.S.A. 13:18A-2; see also N.J.S.A. 13:18A-9 (identifying the specific CMP goals for the preservation area).]

The CMP deemed the Preservation Area District "the most critical ecological region in the Pinelands," recognizing it was "especially vulnerable to degradation" due to its ecological and environmental composition. N.J.A.C. 7:50-5.13(a). It described the "Forest Areas" as "similar to the Preservation Area in terms of their ecological value" and an "essential element of the Pinelands environment." N.J.A.C. 7:50-5.13(b). These findings support the purported disparate treatment.

Lastly, Clayton Sand faults the Commission for "focus[ing] on the ecological aspect of its directives and completely ignor[ing] 'water supply needs' and economic concerns." Given the clear legislative intent behind the Federal Act and the PPA, the Commission did not act arbitrarily or capriciously in focusing on ecological concerns. The remainder of Clayton Sand's assertion is not supported in the record, which included an "Economic Impact" statement in

which the Commission recognized "the potential impacts on the resource extraction industry in the Pinelands Area or the construction industry in general" and concluded that "[u]ltimately, the revisions will result in greater economic protection to the resource extraction industry and the associated construction industries." 55 N.J.R. 580.

C.

Finally, we address Clayton Sand's argument the Commission's adoption of the amendments was so procedurally flawed we should declare the amendments invalid. We are unconvinced.

Clayton Sand faults the Commission for not obtaining written approval of the amendments from the Secretary. Neither the Federal Act nor the PPA requires the Commission to obtain the Secretary's written approval. The Federal Act requires the Commission to submit the CMP and any subsequent revisions to the Secretary. 16 U.S.C. § 471i(g)(1), (4). If the Secretary takes no action, the submissions are deemed approved. 16 U.S.C. § 471i(g)(1). The Commission submitted the proposed amendments to the Secretary; the Secretary has taken no action to disapprove them. Thus, they are deemed approved.

Clayton Sand asserts the Commission failed to comply with N.J.A.C. 7:50-7.4(b) by not conducting a hearing and not providing the public with an

additional opportunity to be heard after it published its response to public comments regarding its revised proposed amendments. The public, including Clayton Sand, had the opportunity to participate in multiple hearings, in which the Commission's chairperson, executive director, or its chief of legal and legislative affairs and other commissioners were present. The Commission considered the comments made during those hearings as well as timely-submitted written comments and substantially revised the original proposed amendments based on those comments. On that record, we do not perceive any procedural infirmity that merits an invalidation of the amendments.

Clayton Sand criticized the Commission's determination that its counsel's August 22, 2023 and August 30, 2023 letters were untimely. It does not dispute counsel submitted the letters months after the June 2, 2023 deadline for the submission of written comments, which was published in the April 3, 2023 notice of proposed substantial changes. We do not discern any error with the untimeliness determination. Moreover, Clayton Sand has not identified any information or arguments set forth in the letters that were not previously presented to the Commission.

To the extent we have not addressed any remaining arguments, we deem them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1476-23